# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-3045
_____

United States of America

*Plaintiff - Appellee*

v.

John Joseph Waters, Jr.

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota - St. Paul

_____

Submitted: May 12, 2015
Filed: August 21, 2015

_____

Before RILEY, Chief Judge, MURPHY and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

   A jury convicted John Waters of mail fraud, wire fraud, and tax-related crimes after hearing evidence that Waters embezzled money from his employer and lied on his taxes.  The district court[1] sentenced Waters to 108 months in prison.  In

_____

   [1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

determining Waters's sentence, the district court found Waters embezzled somewhere between $2.5 and $7 million, used sophisticated means to perpetrate the fraud, and obstructed justice. On appeal, Waters argues there was insufficient evidence to convict him, the district court erred in its loss calculations, the district court erred by applying enhancements for sophisticated means and obstruction of justice, and the district court gave him a substantively unreasonable sentence. We affirm.

I

John Waters first met Gerard Cafesjian in the early 90s. In 1994, Waters obtained a job at West Publishing, where Cafesjian served as a senior executive. In 1995, the company announced it was putting itself up for sale. In preparation for the sale, Cafesjian moved to Florida. Cafesjian soon retired, and, when Thomson Reuters purchased West, Cafesjian sold his shares for approximately $250 million.

When Cafesjian retired, he founded the Cafesjian Family Foundation, Inc., a charitable foundation, and a family office, GLC Enterprises, Inc. GLC had offices in Naples, Florida, and in Minneapolis. In August 1996, Cafesjian hired Waters to manage GLC. Cafesjian and Waters signed a written employment agreement. Cafesjian continued residing in Florida, and Waters was in charge of the day-to-day operations at GLC in Minneapolis.

Cafesjian opened a personal account with Northern Trust Bank of Florida. Cafesjian, Waters, and Cafesjian's personal assistant in Naples, David Starkweather, were signatories on the account. Northern Trust operated a branch in the same building as the Naples GLC office, so, if Cafesjian needed cash for personal use, he would have Starkweather write and cash checks and bring him the proceeds. Using cash, however, was atypical for Cafesjian; he preferred to use credit cards to accumulate rewards points.

-2-

In 1998, Waters opened an account at a US Bank branch in Minneapolis.  Both Cafesjian and Waters were signatories and had access to the account.  Transfers from Cafesjian's Northern Trust account provided the majority of the funds for the US Bank account.  Between 1999 and 2004, Waters wrote and signed more than 120 checks drawn on the US Bank account made out to "cash" or US Bank.  The amounts on those checks were not uneven, varied amounts generally typical of personal expenses.    Instead,  Waters  wrote  most  of  the  checks  for  even,  round amounts—generally exactly $5,000, $6,000, or $7,000.  All but one of the checks were under $10,000.  Waters endorsed and cashed the checks.  The checks written to cash or US bank totaled $1,373,525.

Waters was highly protective of the US Bank account statements.  He had them sent to his office and took great care that no one else saw or opened the statements. Waters also instructed GLC's bookkeeper as to how to itemize expenditures from the account in company records.  Most of the time, Waters instructed the bookkeeper to group the expenditures into large, general groups.  Generally, he instructed the bookkeeper to mark the sums as "household unallocated expenses," a category that corresponded to money spent for Cafesjian's personal use.  Meanwhile, Waters documented account activity in a more detailed spreadsheet on his own computer. For example, where the official company records reported "household unallocated expenses" as $40,000 for one month, Waters's detailed records showed five checks for $7,000 and one check for $5,000.

In 2004, Waters closed the initial US Bank account and transferred the small remaining balance (approximately $12,000) into a new US Bank account.  Cafesjian and Waters were signatories on this new account as well, but the signature card used to  open  the  account  did  not  include  Cafesjian's  original  signature.    Rather,  it contained  only  Cafesjian's  signature  stamp—in  the  possession  of  Waters—and Waters's original signature.

-3-

Waters operated the new US Bank account in the same manner as its predecessor account. Cafesjian's Northern Trust account funded the new US Bank account. Waters was protective of the bank statements and did not allow any other employees to see account activity. Between 2004 and 2009, Waters wrote and endorsed more than 140 checks to "cash," totaling roughly $950,000. He also wrote approximately 140 checks to his then-mistress (now-wife), Cheri Kuhn, for an approximate total of $750,000. Further, Waters used money from the new US Bank account to fund an account he opened in the name of an exchange student who lived with him, Ani Yeranosyan. Waters was a signatory on the Yeranosyan account, and although Yeranosyan returned to Armenia in 2004, Waters continued using the account. He wrote approximately 195 checks made out to Yeranosyan, for over $1 million total.

Yeranosyan died in a snowmobile accident in Armenia in 2007, but Waters continued to use the account. After Yeranosyan's death, Waters wrote and deposited more than 130 checks drawn from the new US Bank account into the Yeranosyan account. The value of checks written after Yeranosyan's death totaled roughly $800,000.

Waters used the Yeranosyan account to distribute money to others. He transferred over $230,000 from the account to an account he held jointly with Kuhn; approximately $251,000 to an account he held jointly with his first wife; approximately $324,000 to his younger daughter; and approximately $103,000 to his older daughter. He also used the Yeranosyan account to pay for personal expenses, including car payments, vacations, and a $13,200 diamond ring. Further, he withdrew over $50,000 in cash.

In early 2009, Waters's and Cafesjian's relationship deteriorated. Waters resigned from GLC on March 30, 2009. After Waters resigned, an account statement from the new US Bank account arrived at the Minneapolis GLC office. GLC Chief

-4-

Financial Officer Gary Jones reviewed the statement and recognized odd activity for an account that supposedly was used for personal expenses; the amounts of various checks showed round, even numbers, generally exactly $5,000, at regular intervals. And most of the checks were not to third parties; rather, the checks were made out to US Bank, signed by Waters, and endorsed by Waters.

Jones called Cafesjian to verify the statement reflected Cafesjian's understanding of the account.  Cafesjian sounded surprised to learn about the activity on the account.[2]  Jones searched for additional statements in the office but was unable to find any, so Jones requested past statements and copies of checks from US Bank. Jones learned that approximately $3 million had traveled through the new US Bank account, but he was unable to determine where the money went.

Cafesjian instructed Jones to ask Waters where the money from the US Bank account had gone.  Jones confronted Waters, and Waters responded the money "was used to purchase art, political contributions, and other things that you don't want to know about."  Jones found this response disconcerting.  According to Jones, any art purchased domestically was paid for by check and any art purchased internationally was paid for by wire transfer.  As to political contributions, Cafesjian had hired an individual to monitor political contributions to ensure the contributions complied with election regulations.  GLC kept records of political contributions.  The checks coming out of the new US Bank account were not recorded in company books as political contributions or as art expenditures.  Notably, during his conversation with Jones, Waters did not mention a deferred compensation plan or a loan from Cafesjian.

_____

[2]Cafesjian passed away prior to trial, and the district court prohibited his deposition testimony from a related civil case.  The only evidence of Cafesjian's beliefs regarding Waters's use of the account were inferences drawn from Cafesjian's reactions upon learning of the activity and Cafesjian's subsequent investigation.

Cafesjian followed up with Jones, and eventually, in 2011, hired a Minneapolis law firm to investigate Waters's handling of the new US Bank account. In turn, the law firm hired an investigative agency to review records and determine what had occurred with the account.

A former FBI agent, Rick Ostrom, led the investigation. Ostrom discovered the new US Bank account was funded almost entirely with money from Cafesjian's Northern Trust account. Waters had written a number of checks drawn from Cafesjian's Northern Trust account, endorsed the checks, and deposited them into the new US Bank account. Ostrom also tracked where the money went after it hit the new US Bank account—to other accounts controlled by Waters or to cash. Upon learning the origin and destination of the money in the new US Bank account, Cafesjian directed Ostrom to interview Waters.

Ostrom called Waters and told him the investigative company was completing a "financial review of certain records." During an initial phone call, Waters asserted Cafesjian had dementia, a poor memory, and other mental issues—facts with which no one else concurred. Waters also told Ostrom that "there could be consequences for Mr. Cafesjian, his family, the business, everything [Cafesjian] had worked on for years if [Waters] was to sit down and talk with [Ostrom]." Waters mentioned a checking account that Cafesjian had opened. Waters claimed none of the money went to Waters; rather, the checks were used to obtain "cash to be kept in the safe, . . . artwork, expenses for . . . trips to Armenia, other grants, giving money to other people[,] . . . and giving cash to Mr. Cafesjian . . . when [Cafesjian] was in Minnesota." Waters ended the phone call without agreeing to an in-person interview.

Waters and Ostrom talked on a few subsequent occasions, but Waters did not agree to an in-person interview. During those phone calls, Waters did not mention the Kuhn or Yeranosyan accounts, and he claimed that Cafesjian had wanted Waters to put money in Waters's account to "muddy the waters." Waters also did not

-6-

mention a modified employment agreement or a loan of any type. After Ostrom reported back to the law firm and Cafesjian in late summer 2011, Cafesjian contacted law enforcement to initiate a criminal investigation.

Law enforcement agents contacted Waters in the fall of 2011, and Waters gave them a story similar to the one he gave Ostrom: Cafesjian suffered from dementia and memory loss, Cafesjian had a number of secrets he kept from his family, and Cafesjian had requested Waters to move funds between accounts to benefit Cafesjian. Waters did not agree to an in-person interview at that time and told an FBI agent that if he met with law enforcement he would have to "divulge details" about Cafesjian.

A few months after law enforcement began its investigation, Waters sued Cafesjian, GLC, and the Cafesjian Family Foundation in a civil suit, claiming, for the first time, that Cafesjian and the companies owed him millions of dollars in deferred compensation. The defendants cross-claimed for fraud. Waters argued he and Cafesjian had modified his employment contract orally in 2000. He claimed the two decided not to memorialize the agreement in writing due to Cafesjian's alleged secretive tendencies. Under the alleged modified agreement, Cafesjian would pay Waters based on the performance of the company's portfolio. Cafesjian and Waters also allegedly agreed on a deferred compensation plan. In 2005, Waters began taking "loans" against the deferred compensation from the new US Bank account. Overall, Waters claimed all the money taken from the predecessor US Bank account and the new US Bank account was to benefit Cafesjian, additional payment under the modified employment agreement, or a loan against deferred compensation.

The district court in the civil case eventually granted summary judgment in the defendants' favor on all of Waters's claims but allowed the cross-claims to remain. Once criminal charges were brought, the district court stayed the civil case.

-7-

Meanwhile, law enforcement had discovered sufficient evidence to charge Waters criminally. A grand jury indicted Waters on four counts of mail fraud, sixteen counts of wire fraud, three counts of tax evasion, and three counts of filing false income tax returns.[3] The mail fraud charges stemmed from Waters's handling of the new US Bank account's statements. The wire fraud counts arose from Waters's use of electronic means, including faxes, to facilitate money transfers between Cafesjian's Northern Trust account, a different GLC account, and the Waters-controlled new US Bank account. The tax charges were related to Waters's failure to report money taken from the new US Bank account as income and underreporting his income in 2007, 2008, and 2009.

At trial, Waters did not dispute that the underlying transactions occurred or that he failed to include additional compensation on his tax returns. Rather, he suggested that he did not intend to defraud the company and that Cafesjian was aware of the account activity. He also pleaded ignorance as to the tax charges—he may have inaccurately reported his income, but he did not intend to do so because he believed loans from deferred compensation did not constitute reportable income. He reasserted as his defense the theory from the civil case: much of the activity benefited Cafesjian and any activity that did not directly do so was either payment from the modified employment agreement or a loan based on deferred compensation.

The government presented substantial evidence to rebut Waters's explanation of account activity. With respect to the alleged employment-agreement modification, the government showed that no one but Waters knew of the alleged agreement. GLC's records did not reflect an alleged modified agreement. Cafesjian's estate attorney did not know of the alleged deferred compensation agreement, nor did GLC's Chief Financial Officer or accountant. Tax records did not indicate any type of deferred compensation. A divorce decree related to Waters's 2007 divorce failed

---

[3]One count of wire fraud was dismissed prior to trial.

-8-

to discuss any alleged deferred compensation.   Evidence also showed Waters structured financial transactions—limiting cash transactions to under $10,000 per day to avoid reporting requirements. Further, GLC employees testified Waters hid the US Bank accounts' statements and expenditures.  The employees also testified Cafesjian was surprised to learn about Waters's use of the US Bank accounts.  These witnesses described Cafesjian's actions after Cafesjian learned about Waters's activity; Cafesjian's actions included hiring a law firm to investigate financial records and eventually referring the case to law enforcement.   The jury rejected Waters's explanations and convicted him on all charges.

Prior to sentencing, probation completed a presentence investigation report (PSR), finding the total loss amount was between $2.5 and 7 million, corresponding to an 18-level increase in the Guidelines offense level.  The PSR also recommended Waters was subject to enhancements for obstruction of justice and the use of sophisticated means.  Waters objected to these findings, but the district court agreed with the PSR.  The district court found an offense level of 31 and a criminal history category I.  The offense level and history corresponded to an advisory Guidelines range of 108 to 135 months' imprisonment.  The district court sentenced Waters to 108 months.

Waters appeals.  He claims his conviction was not supported by sufficient evidence.  He also appeals his sentence.  He claims three procedural errors: the district court's loss amounts were erroneous, the district court erred by finding the crime was perpetrated by sophisticated means, and the district court erred by enhancing his sentence for obstruction of justice.  Finally, Waters contends his low-end-of-the-Guidelines-range sentence was substantively unreasonable.

-9-

II

Waters contends there was insufficient evidence to support his conviction. We review sufficiency challenges de novo, viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences from that evidence that support the verdict. United States v. Wells, 706 F.3d 908, 914 (8th Cir. 2013). We will affirm a jury's verdict unless "no reasonable jury could have found the defendant guilty beyond a reasonable doubt." Id. (quoting United States v. Yang, 603 F.3d 1024, 1026 (8th Cir. 2010)). So long as evidence consistent with guilt was present, we will not reverse a conviction simply because the evidence may also be consistent with a different explanation. United States v. Thomas, 593 F.3d 752, 760 (8th Cir. 2010).

Waters contends the evidence at trial failed to show that he intended to defraud Cafesjian or the company. He points to the fact that Cafesjian was listed as a carbon copy recipient on various accounting documents that reflected transactions between Cafesjian's Northern Trust account and the Waters-controlled US Bank account, marked on the daily reports as "GLC Checking." Because Cafesjian allowed these transfers to continue and was aware of them, according to Waters, the evidence was insufficient to demonstrate fraud. Simply put, Waters asserts this is unassailable evidence that Waters did not intend to defraud Cafesjian and that he and Cafesjian modified the employment agreement.

The record, when taken in the light most favorable to the government, however, belies Waters's argument. As described above, there was ample evidence to demonstrate Waters's defense was a post hoc falsity to cover his fraud. There was no documentation of the alleged agreement between Waters and Cafesjian. Waters hid bank statements and took great care to ensure no one saw the statements. Cafesjian's estate attorney testified that Cafesjian never discussed any type of deferred compensation agreement and that this type of agreement would be important to note

-10-

in estate documents.  GLC's CFO also was completely unaware of the alleged agreement.  When Cafesjian became aware of the account activity, he was surprised and hired a law firm to investigate Waters.

Waters himself did not mention the alleged modification until he filed his civil case.  When approached by a private investigator, Waters did not say anything about a modified employment agreement or loans.  When approached by law enforcement prior to his civil case, Waters did not reveal the existence of the alleged modification or loans.  Waters also testified in a 2009 deposition in an unrelated civil case that he had "a contract negotiated and signed in 1996 that was never subsequently changed, modified or updated."  When asked at the deposition whether his compensation or bonus was tied to the "success of [Cafesjian's] investments," Waters responded, "no." In the deposition, he also specifically disavowed any compensation other than a salary and a bonus.  When confronting financial troubles in late 2009 and talking with his landlord, Waters did not mention deferred compensation.

Waters's argument with respect to the tax crimes relies on the argument that the withdrawals from the new US Bank Account were loans against deferred compensation.  Waters argues he was unaware he had to report loans against deferred compensation as income.  The record, taken in the light most favorable to the government, demonstrates there was no employment-agreement modification or any deferred compensation against which to take loans.

There was sufficient evidence to convict Waters on all charges.

III

Next, Waters argues that the district court erred in its Guidelines calculation. Specifically, he argues the district court's loss-amount calculation was error, the district court erroneously enhanced his offense level by finding Waters committed the

-11-

crimes using sophisticated means, and the district court erroneously enhanced his offense level by finding he obstructed justice. "We review interpretation of the Sentencing Guidelines de novo and a district court's application of the Guidelines to the facts for clear error." United States v. Adejumo, 772 F.3d 513, 526 (8th Cir. 2014) (quoting United States v. Rutherford, 599 F.3d 817, 820 (8th Cir. 2010)).

A.     Loss Calculations

In a fraud case, it is often difficult to calculate the precise amount of monetary loss, so the district court "need only make a reasonable estimate of the loss." Id. (quoting United States Sentencing Guidelines § 2B1.1 cmt. n.3(C)). The district court bases the estimate on a preponderance of the evidence. Id. Waters argues the district court erred by imposing an 18-level increase for a loss amount between $2.5 and 7 million. He asserts the loss amount should be decreased by the checks written to "cash" because they were used for Cafesjian's benefit and, discounting the loss amount for "cash," the total loss amount was approximately $1.9 million, corresponding to a 16-level enhancement.

An IRS agent forensically examined the two US Bank accounts. She determined the total amount taken out of those accounts was roughly $4.3 million. Waters does not dispute this figure. Out of that $4.3 million, approximately $2.4 million was written to "cash." Because cash is hard to trace and because Waters asserts he used the cash for Cafesjian's benefit, Waters contends the entire $2.4 million in cash should be deducted from the loss calculation. The district court recognized that it was likely some of the cash was used for Cafesjian's benefit and agreed the $4.3 million figure was "slightly inflated." But, the district court found that it was not so inflated to bring the total loss below $2.5 million.

This factual determination was not clearly erroneous. See United States v. Hodge, 588 F.3d 970, 973 (8th Cir. 2009). Evidence showed that Waters deposited

-12-

cash into various personal accounts within hours of cashing checks drawn from the new US Bank account.  Further, testimony indicated Cafesjian did not use cash or keep secret many of the activities or items Waters claimed to spend money on (e.g., political contributions and art).  The 18-level enhancement was supported by the record.

>        B.        Sophisticated Means

Whether a scheme is "sophisticated" is a factual question that we review only for clear error.  United States v. Huston, 744 F.3d 589, 592 (8th Cir. 2014).  Under the Guidelines, a two-level enhancement may occur if the defendant used "sophisticated means" to commit his crime.    USSG § 2B1.1(b)(10)(C). "'[S]ophisiticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."  USSG § 2B1.1 cmt. n.9(B).  "Even if any single step is not complicated, repetitive and coordinated conduct can amount to a sophisticated scheme."  Huston, 744 F.3d at 591–92 (quoting United States v. Fiorito, 640 F.3d 338, 351 (8th Cir. 2011)).   A scheme is sophisticated when it is more intricate than a garden-variety offense.  United States v. Norwood, 774 F.3d 476, 479 (8th Cir. 2014) (per curiam).

Here, the district court found Waters's scheme went beyond the "average" fraud case because of Waters's "handling of the US Bank statements, . . . the secret spreadsheet . . . , the fictitious entries made and the length of time that this happened, basically a decade long, beginning in 1999, over and over again . . . convinces [the court] that this is something more sophisticated than the average fraud case . . . ." This finding was not clearly erroneous.

-13-

C.    Obstruction of Justice

Whether a defendant committed perjury is a factual finding that we review for clear error. United States v. Petrovic, 701 F.3d 849, 859 (8th Cir. 2012). Committing perjury at trial is a reason to apply a two-level enhancement for obstruction of justice. USSG § 3C1.1 cmt. n.4(B). Perjury occurs when a witness "gives false testimony concerning a material matter with the wilfull intent to provide false testimony." Petrovic, 701 F.3d at 859 (quoting United States v. Dunnigan, 507 U.S. 87, 94 (1993)). The enhancement does not apply when the false testimony is simply due to the defendant's "confusion, mistake, or faulty memory." USSG § 3C1.1 cmt. n.2.

Here, the district court found the enhancement applied because of:

> the nature of [Waters's] testimony as [Waters] sat here ducking, bobbing and weaving around the objective evidence by way of the documents with a different explanation, a tweak or a twist or a nuance that somehow seemed in his mind appropriate to have an explanation for everything and a different version of the facts and reality than was reflected in the cold, hard, documents.[4]

The overwhelming evidence at trial demonstrated Waters invented the modified-employment-agreement explanation as a way to cover up his fraud. It was not simply the result of "confusion, mistake, or faulty memory." See id. The district court did not clearly err by finding Waters committed perjury.

---

[4]We note that the district court relied on a second basis to apply the enhancement. We need not address that basis because the finding of perjury is sufficient to affirm.

-14-

IV

Finally, Waters contends the district court's sentence was substantively unreasonable.  After properly calculating Waters's offense level as 31 and criminal history category I, the district court determined the advisory Guidelines range was 108–135 months' imprisonment.  It sentenced Waters at the lowest end of the range, 108 months.

On appeal, we presume a within-Guidelines-range sentence is reasonable.  Huston, 744 F.3d at 593.  And the defendant bears the burden to demonstrate his sentence is substantively unreasonable.  United States v. Bolden, 596 F.3d 976, 984 (8th Cir. 2010).  We review the substantive reasonableness of a sentence for an abuse of discretion.  United States v. Feemster, 572 F.3d 455, 461 (8th Cir. 2009) (en banc). With respect to sentencing, a district court abuses its discretion only when it "fails to consider a relevant factor that should have received significant weight[,] gives significant weight to an improper or irrelevant factor[,] or . . . considers only the appropriate factors but in weighing those factors commits a clear error of judgment." Id. (quoting United States v. Kane, 552 F.3d 748, 752 (8th Cir. 2009)) (internal quotation marks omitted).

Waters argues the district court abused its discretion by not giving enough weight to supposed mitigating factors and by relying on an improper factor, Waters's false testimony.  We disagree.  With respect to mitigating factors, the district court considered both written and oral arguments presented by the defendant.  We presume that the district court adequately considered these arguments when making its decision.  United States v. Johnson, 619 F.3d 910, 922 (8th Cir. 2010).  The district court noted Waters received a flood of supportive letters and indicated it had considered those letters.  It mentioned many mitigating factors when handing down Waters's sentence. Further, there is no indication the district court "punished" Waters for testifying on his own behalf.  The district court noted—for a second time—that

-15-

Waters perjured himself at trial. It also noted Waters failed to show any remorse. These are appropriate factors to consider when determining a sentence. See 18 U.S.C. § 3553(a)(1) (directing the district court to consider the "characteristics of the defendant"); id. § 3553(a)(2)(A) (recognizing "the need for the sentence imposed . . . to promote respect for the law"). The district court did not abuse its discretion by sentencing Waters to 108 months in prison.

V

The judgment of the district court is affirmed.

_____

-16-